(C.D. 2462)

HEALTHWAY'S, INC., ET AL. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided June 15, 1964)

*Glad & Tuttle* (*Edward N. Glad* of counsel) for the plaintiffs.
*John W. Douglas*, Assistant Attorney General (*James F. O'Hara* and *Charles P. Deem*, trial attorneys), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges

RAO, Judge: The four cases here involved, which have been consolidated for purposes of trial, are concerned with the proper dutiable classification of certain inflatable boats imported from Germany. The items in issue were invoiced as Neptune II with bag, H. No. 3213; Inka with bag, H. No. 3212; and Poseidon-Super with bag, H. No. 3214, or Poseidon-Super boats, H. No. 3214. They are composed of rubberized canvas.

The collector of customs at the port of entry classified said boats within the provisions of paragraph 923 of the Tariff Act of 1930, as modified by the Japanese Protocol to the General Agreement on Tariffs and Trade, 90 Treas. Dec. 234, T.D. 53865, supplemented by Presidential notification, 90 Treas. Dec. 280, T.D. 53877, for manufactures, wholly or in chief value of cotton, not specially provided for, and, accordingly, assessed duty thereon at the rate of 20 per centum ad valorem.

It is the contention of plaintiffs that said merchandise consists of motorboats within the contemplation of paragraph 370 of said act, as modified by the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade, 91 Treas. Dec. 150, T.D. 54108, which are dutiable at the rate of 6 per centum ad valorem.

The competing tariff provisions are as follows:

Paragraph 923, as modified, *supra*—

All manufactures, wholly or in chief value of cotton, not specially provided for:
 \* \* \* \* \* \* \*
 Other (except \* \* \*)_____ 20% ad val.

Paragraph 370, as modified, *supra*—

Motor boats:
 Valued not over $15,000 each_____ 6% ad val.

The term "motor boat" is defined in paragraph 370 of the Tariff Act of 1930, as originally enacted, as follows:

\* \* \* The term "motor boat," when used in this Act, includes a yacht or pleasure boat, regardless of length or tonnage, whether sail, steam, or motor propelled, owned by a resident of the United States or brought into the United States for sale or charter to a resident thereof, whether or not such yacht or boat is brought into the United States under its own power, but does not include a yacht or boat used or intended to be used in trade or commerce, nor a yacht or boat built, or for the building of which a contract was entered into, prior to December 1, 1927.

At the trial of these cases, one witness testified on behalf of plaintiffs and two exhibits were introduced to illustrate his testimony. The official papers were also received in evidence without being marked for the purpose of showing that the subject articles were not valued at over $15,000 each. No proof was offered by the Government.

Plaintiffs' witness was Maurice Bentley, executive vice president and general manager of the company which is engaged in the business of importing, manufacturing, and distributing sporting goods on a nationwide basis. Mr. Bentley, who has been with the company since 1948, is in charge of coordinating the complete functions of the business, including selling, manufacturing, purchasing, and development of products. In that capacity and by reason of personal use, he is familiar with the subject merchandise which the company has been importing for about 6 or 7 years.

Mr. Bentley identified plaintiffs' illustrative exhibit 1 as a brochure in which the imported items are shown, the Poseidon under the name of Jumbo, the Inka under that name, and the Neptune II as "River." He stated that, as imported, these boats are equipped with what he described as motor mounts, that is, tubular parts that adhere to the boat itself at various points around the rim, as indicated by the letter "A" which he placed on each picture in the exhibit. The motor mounts serve the sole purpose of receiving steel tubes which support the motor—"the motors are mounted on the boats in the places provided on the boats for the installation of certain tubular steel parts, and *in the back of the two particular boats there is an opening where the motor is placed on the boat*. Particularly, these motor mounts are put there for the purpose of installing a motor." [Italics supplied.] The boats are also equipped with oarlocks, but no oars, steel tubes, or motors accompany the importation.

The witness described plaintiffs' illustrative exhibit 2 as a picture of the Poseidon-Super, showing how the boat can be used with motor mounts and motor attached. He further testified that the boats were made in compartments, with the strength confined to definite areas, so that in case of a blowout in one section caused by the speed at which it was traveling, the boat would remain afloat. He contrasted this con-

struction with the way in which boats "not used with motors" are made. These, he said, would simply collapse if one section deflates.

The particular boat which he personally had used was the Inka. With a motor, he was able to operate it at a speed of from 8 to 10 knots. He believed, however, that he could not row a boat faster than 2 knots.

On cross-examination, Mr. Bentley reiterated that the boats were imported without paddles or motors. He also stated that they are suitable for use with paddles and that there is a mount on the Poseidon which makes it suitable for use with a sail. He could not recall whether or not, at the time of importation, there was a motor mount on the Neptune and agreed that, without the mounting, it could not be a motorboat. The witness further admitted that boats are generally made from other substances than the rubber and cloth of which the instant boats are composed.

It is the contention of plaintiffs that, under authority of the cases of *A. W. Fenton Co.* v. *United States*, 15 Cust. Ct. 200, C.D. 972, and *Robert E. Landweer* v. *United States*, 23 Cust. Ct. 171, Abstract 53576, the instant boats fall within the statutory definition of motorboats since, as imported, they are equipped to be operated as motorboats. It is further urged that since the statutory definition also embraces sailboats, it is of no consequence that the Poseidon is designed to have a sail attached, citing *Ratsey Lapthorn, Inc.* v. *United States*, 26 Cust. Ct. 84, C.D. 1304; and that the fact that outboard motors are not imported with the subject boats does not detract from their status as motorboats, since, under authority of *William M. Barber et al.* v. *United States*, 6 Cust. Ct. 340, C.D. 492, unfinished motorboats, unaccompanied by motors at the time of importation, are, nevertheless, motorboats.

The gravamen of defendant's position is that the provision for motorboats in paragraph 370 of the tariff act, as originally enacted, contemplates boats which are normally or chiefly propelled by steam, sail, or motor, as the case may be, and that the fact that a boat simply possesses the capacity to be so operated does not entitle it to classification as a motorboat. It is counsel's contention that the instant record is inadequate to establish that the subject boats are chiefly used as motorboats. In any event, it is urged that there is no evidence to support the allegation that the Neptune II boat, illustrated as the "River" boat, as imported, is even equipped to accommodate a motor.

As to this latter point, it seems clear that the record is deficient in the respect indicated. The "River," as depicted on plaintiffs' illustrative exhibit 1, is a kayak or canoe-type inflated boat. Its bow and stern are both pointed and do not appear to afford any space for the attachment of a motor. The exhibit shows no "motor mounts" for the insertion of the tubular steel motor braces, and the witness had no actual

recollection that this model was, in fact, imported with motor mounts. As he himself agreed, "obviously, without the mounting, it could not be a motor boat." The claim as to the invoice item Neptune II with bag, H. No. 3213, is, therefore, overruled.

As to the other items here involved, we are constrained to hold that under the authorities cited they must be considered to be motorboats, within the statutory definition, and that chief use with a motor is not necessarily a determining factor.

Involved in the *Fenton* case, *supra*, was a wooden boat, measuring about 13 feet in length, 50 inches in width, and valued at about $75. The boat was equipped with oarlocks, but so constructed as to be straight across the back for the attachment of an outboard motor. Neither oars nor motor was imported with the boat, and the record showed simply that while the boat could be propelled by oars, it was more common to use an outboard motor.

In concluding that the boats there in issue were motorboats, as provided for in paragraph 370 of the Tariff Act of 1930, as modified by the trade agreement with Canada, 74 Treas. Dec. 235, T.D. 49752, the court entered upon the following discussion:

In a digest of information concerning products on which concessions were granted by the United States in the trade agreement with Canada, published by the United States Tariff Commission, the following appears in volume II, page 3–44, under the heading "Motor Boats":

The pleasure craft covered by paragraph 370 range from sea-going vessels of 2,000 gross tons and more to tiny outboards and sail boats, 7 or 8 feet long. The entire range may be classified according to the method of propulsion, as follows:

(1) Steam yachts. * * *

(2) Sailing craft. * * *

(3) Motor craft. This is the outstanding group covered by paragraph 370; it too includes a wide range of sizes, from large Diesel yachts to small skiffs or canoes driven by outboard motors.

(4) Motor sailers. * * *

In *United States* v. *Good Neighbor Imports, Inc.*, 33 C.C.P.A. 91, C.A.D. 321, decided November 5, 1945, our appellate court held that judicial notice may be taken of the information supplied in such digests of trade data published by the Tariff Commission, stating:

It is obvious that the information supplied in the foregoing digests is pertinent to the issue here involved and that the court may take judicial knowledge thereof. Such information is not binding upon the court but it may be considered as bearing upon the identity of the merchandise under consideration.

In *United States* v. *Wepner*, 32 C.C.P.A. 30, C.A.D. 282, our appellate court, in discussing paragraph 370, stated:

It will be observed that in the paragraph Congress legislatively defined the term "motor boat," and broadened its definition beyond the ordinary dictionary definitions of the term, in that it provided for the inclusion of

yachts or pleasure boats propelled by sail or steam, as well as those propelled by motor, within the definition. Also, it provided, in effect, that all the yachts or pleasure boats should be subject to the duty *"regardless of length or tonnage."* [Italics quoted.]

It would seem clear that the boat in question falls within the comprehensive definition of "motor boat" contained in paragraph 370. We therefore hold it to be properly dutiable at 15 per centum ad valorem under said paragraph and the Canadian Trade Agreement, and the protest claim is sustained. * * *

A similar view was adopted in *Robert E. Landweer* v. *United States, supra*, with reference to molded plywood boats, 7 feet 10 inches or 9 feet long, used as dinghies for yachts. Predicated upon a record which established that those boats were manufactured with a "transom stern," that is flat across the back, strengthened, and braced so that an outboard motor could be attached and that the rake or slope of the stern from top to bottom was only about 1½ inches, the court held the involved boats to be motorboats within said paragraph 370, as modified by the Canadian Trade Agreement, even though they were fitted with oarlocks and, as imported, were not equipped with motors.

Thus, it would appear that the criterion for classifying pleasure boats within the broadened definition of the term in paragraph 370 of the Tariff Act of 1930 is their suitability for being propelled by sail, steam, or motor, and whether or not, after importation, they are chiefly so used is not necessarily determinative. The Poseidon and Inka boats here involved have been shown to satisfy that test. They are made in compartments to prevent deflation; there is an opening in the stern for the placement of a motor; and there are mounts on the sides to accommodate the motor supports.

By reason of the foregoing, we hold the inflatable boats here in issue, invoiced as Inka with bag, H. No. 3212, and Poseidon-Super with bag, H. No. 3214, or Poseidon-Super boats, H. No. 3214, to be motorboats within the purview of paragraph 370 of the Tariff Act of 1930, as modified by the sixth protocol, *supra*, dutiable at the rate of 6 per centum ad valorem. In all other respects and as to all other merchandise, all other claims are overruled.

Judgment will be entered accordingly.