60 CCPA

EATON MANUFACTURING CO. et al., Appellant,

v.

The UNITED STATES, Appellee.

The UNITED STATES, Appellant,

v.

EATON MANUFACTURING CO. et al., Appellee.

Customs Appeals Nos. 5476, 5478.

United States Court of Customs and Patent Appeals.

Nov. 30, 1972.

---

**1100**

Sharretts, Paley, Carter & Blauvelt, New York City, attys. of record, for appellants. Eugene F. Blauvelt, M. Barry Levy, New York City, of counsel.

Harlington Wood, Jr., Asst. Atty. Gen., Andrew P. Vance, Chief, Customs Section, Robert Blanc and John A. Gussow, New York City, for the United States.

Before MARKEY, Chief Judge, RICH, ALMOND, BALDWIN and LANE, Judges.

LANE, Judge.

These appeals are from the decision and judgment of the Customs Court, 66 Cust.Ct. 293, C.D. 4207 (1971), dismissing four protests and sustaining other protests to the classification of certain goods following a consolidated trial of all the protests. In Appeal No. 5476, appellants (hereinafter referred to as Eaton) assert that the Customs Court committed reversible error in dismissing the protests for insufficiency and lack of a justiciable issue. We agree and, accordingly, reverse and remand. In Appeal No. 5478, the Government contends that the original classification of the involved goods was correct and that the protests should have been overruled. Eaton urges that the protests should have been sustained on an alternative classification. We agree with Eaton and reverse the judgment of the lower court.

The appeals stem from protests involving engines and outdrives imported from Sweden for use in the manufacture of power boats. Eaton called four witnesses at trial. Briefly, it appears that the engine is the source of power for the operation of the propeller which causes a boat to move. An outdrive functions as a transmission and includes a gear box and, usually, a clutch. The testimony indicates that engines and outdrives are independent. That is, an engine may be imported and used with various outdrives or an outdrive may be imported and used with various engines. The two devices are not physically connected when imported, and they are usually not imported in equal numbers. Several of the witnesses agreed that an estimated 90% of imported outdrives and engines are used in the manufacture of pleasure boats with the remainder being used in various types of commercial boats and naval vessels. The imported merchandise is sold to boat manufacturers.

### APPEAL NO. 5476

This appeal involves the disposition by the Customs Court of protests 65/13083,

67/17604, 67/70250(a), and 68/46572 (hereafter the '083, '604, '250, and '572 protests respectively). The Customs Court dismissed the '083 protest on the ground that it failed to present a justiciable issue. The '604, '250, and '572 protests were dismissed on the ground that they were insufficient.

### The '083 Protest

The merchandise of the '083 protest consisted of both engines and outdrives. The engines were classified as internal combustion engines under item 660.44 of Schedule 6, Part 4, Subpart A of the Tariff Schedules of the United States (TSUS) which reads as follows:

> Internal combustion engines and parts thereof:
> Piston-type engines:
> \*   \*   \*   \*   \*   \*
> Other:
> \*   \*   \*   \*   \*   \*
> 660.44    Engines other than compression-ignition engines ............... \*   \*   \*.

The outdrives were classified as parts of pleasure boats under item 696.15 of Schedule 6, Part 6, Subpart D, which reads as follows:

> Yachts or pleasure boats, regardless of length or tonnage, whether motor, sail, or steam propelled, owned by a resident of the United States or brought into the United States for sale or charter to a resident thereof, whether or not such yachts or boats are brought into the United States under their own power; and parts thereof:
> \*   \*   \*   \*   \*   \*
> 696.15    Parts ..................... \*   \*   \*.

In the '083 protest, Eaton claimed that:

> Said merchandise is dutiable as an entirety with the marine engines described on the invoice at 8.5% ad valorem under item 660.44 \*   \*   \* by virtue of subheadnote 3 of Schedule 6, Part 4 \*   \*   \*.

The Customs Court acknowledged that "said merchandise" obviously referred to the outdrives which, according to Eaton, should have been classified with the engines. Appellants later filed a motion to amend the protest to include an alternative claim for classification of the outdrives as fixed ratio speed changers under item 680.45 of Schedule 6, Part 4, Subpart J, which provides in part:

> Gear boxes and other speed changers with fixed, multiple, or variable ratios; \*   \*   \* and parts thereof:
> Gear boxes and other speed changers, and parts thereof:
> 680.45    Fixed ratio speed changers multiple and variable ratio speed changers each ratio of which is selected by manual manipulation, and parts thereof ............... \*   \*   \*.

The Government raised no objection to the motion to amend, and it was granted prior to trial.

Part 4, headnote 3 referred to in the '083 protest provides that:

> An electric motor or other power unit imported with a machine is classifiable with such machine as an entirety if fitted thereto when imported, or, if the machine or its framework is designed to receive the power unit, or if the shipment includes a common base designed to receive both the power unit and the machine.

Speaking of this headnote, the Customs Court stated:

> The provision is undoubtedly new, [footnote omitted] and appears to undertake to rally together the usual components of machines under the various part 4 provisions for machines and provisions for machines found elsewhere in the tariff schedules.
>
> Headnote 3 clearly does not provide for classification of the machine *with the power unit* with which the machine is imported—the converse of the proposition described in the headnote. In other words, under headnote 3 when engines and outdrives are imported together under the circumstances detailed in the headnote, the engines are to be treated in effect as "machine parts," losing their separate identities and taking on that of the outdrives or machines with which the engines are imported, for classification purposes. However, the claim set forth in protest 65/13083 purports, in the name of headnote 3, to seek classification of the outdrives as "engine parts," with the outdrives losing their separate

identities and taking on that of the engines with which the outdrives are imported, for classification purposes—a posture which is wholly outside of the scope of headnote 3 as we read its provisions. And since no justiciable claim is set forth in said protest as filed, it did not confer jurisdiction upon the court, may not be amended, and must be dismissed for legal insufficiency on this account. * * * Accordingly, the motion herein to amend protest 65/13083 is denied, and said protest is dismissed for lack of jurisdiction in the court to entertain it.

■ As Mr. Chief Justice Warren, writing for a majority of the Supreme Court, said in Flast v. Cohen, 392 U.S. 83, 94–95, 88 S.Ct. 1942, at 1949, 20 L. Ed.2d 947 (1968):

> [T]he judicial power of federal courts is constitutionally restricted to "cases" and "controversies." * * * In part those words limit the business of federal courts to questions presented in an adversary context and in a form historically viewed as capable of resolution through the judicial process. And in part those words define the role assigned to the judiciary in a tripartite allocation of power to assure that the federal courts will not intrude into areas committed to the other branches of government. Justiciability is the term of art employed to give expression to this dual limitation placed upon federal courts by the case-and-controversy doctrine.

> Justiciability is itself a concept of uncertain meaning and scope. * * [N]o justiciable controversy is presented when the parties seek adjudication of only a political question, when the parties are asking for an advisory opinion, when the question sought to be adjudicated has been mooted by subsequent developments, and when there is no standing to maintain the action. [Footnotes omitted.]

■ In the present case, the finding of non-justiciability rests upon an in-

terpretation of the headnote relied upon by Eaton which, in the view of the Customs Court, renders Eaton's claim untenable. That premise for non-justiciability is vastly different from such findings as lack of standing, mootness, merely advisory opinion as opposed to resolution of an actual controversy, and political question, none of which are remotely involved in the adjudication of the claim set forth in the '083 protest. While the scope of justiciable controversy is not defined with fixed precision by these exemplars, they are the typical grounds for a holding of failure to present the court with a justiciable issue.

■ The Government asks for affirmance of the Custom's Court's judgment on this matter on the ground that the claim is "frivolous." While it is questionable that a frivolous claim fails to pose a justiciable issue, which is what the Government must inherently be assuming, we do not think the '083 protest can in any event be fairly characterized as frivolous. The Customs Court observed that the headnote provision is new and its language cannot be said to be so clear that the interpretation suggested in the protest lacks all credence on its face. However correct the court might have been in its conclusion, we agree with Eaton that the protest properly raised an issue for resolution and should not have been dismissed as a nullity. We accordingly hold that the '083 protest was sufficient to confer jurisdiction on the Customs Court.

*The '604, '250, and '572 Protests*

The merchandise involved in these protests consisted of both engines and outdrives, but unlike the '083 protest, the goods here were appraised as entireties and classified under item 696.15 TSUS as parts of pleasure boats. In each case, the protest began:

> PROTEST is hereby made against your decision assessing duty * * * under item 696.15 MACHINE PARTS * * * on all merchandise covered

by the entry named below. The reasons for objection are as follows:

The Customs Court dismissed these protests *sua sponte* on the ground that they were legally insufficient as a result of the use of the phrase "Machine Parts" which, in the court's view, failed to indicate the specific goods intended to be covered by the claimed classification. It is apparent that Eaton could have objected to the classification of solely the outdrives, solely the engines, or both the outdrives and engines in any of these protests.

The '604 protest claimed that "said merchandise" should have been classified under item 678.50 as "[M]achines not specially provided for, and parts thereof * * *." Eaton later filed a motion to amend the protest to include the alternative claims "that the merchandise is properly dutiable * * * under Item 680.45 TSUS [as fixed ratio speed changers] and/or * * * under Item 660.44 TSUS [as internal combustion engines].

The '250 protest asserted the following claim:

We claim that said merchandise is properly dutiable * * * under Item 678.50 * * * or as an entirety with the marine engines described on the invoice * * * under Item 660.44 * * * by virtue of subheadnote 3 of Schedule 6, Part 4 * * *.

From that language, it would seem that the '250 protest, like the '083 protest, was directed to the outdrives. There was a motion to amend the '250 protest to include the alternative claim for classification of "said merchandise" under item 680.45.

The '572 protest claimed that "said merchandise" is properly classifiable under either item 660.44 or item 678.50. A motion to amend the protest to include a claim for classification under item 680.45 was filed. The Government registered no objection to this motion or the other motions, and each was granted prior to trial.

At the trial of the consolidated protests, counsel for Eaton commenced with the following statement:

The cases before the court this morning involve certain engines and certain outdrives which were imported from Sweden by the Chrysler Corporation and the Eaton Manufacturing Company, plaintiffs herein.

Some of the cases noticed for trial involve shipments of outdrives only, and others consist of both engines and outdrives.

The engines which are * * * the subject of * * * Protest 65/13083, were assessed as internal combustion engines under the provisions in Item 660.44, T.S.U.S.

* * * * * *

Plaintiffs believe the classification of these engines is correct. However, the engines which are the subject of the remaining entries in protest before the court this morning were classified as parts of pleasure boats, under the provisions of Item 696.15, T.S.U.S. The outdrives, whether imported separately or together with engines, were also classified as parts of pleasure boats, under the provisions of Item 696.15, T.S.U.S.

Plaintiffs claim that the imported articles are not entireties, and that the engines are properly dutiable as such, under Item 660.44, T.S.U.S.; and that the outdrives are properly dutiable as fixed ratio speed changers, provided for in Item 680.45, T.S.U.S., or as machines, not specially provided for, under Item 678.50, T.S.U.S.

Should the court hold that the engines and outdrives are entireties, plaintiffs alternatively claim that said entirety is properly dutiable as a machine, not specially provided for, under the provision of Item 678.50, T.S.U.S., or as [an] internal combustion engine, under Item 660.44, T.S.U.S., or as a fixed ratio speed changer Item 678.50, T.S.U.S.

The Customs Court noted those remarks and reasoned that if Eaton in-

tended the phrase "Machine Parts" as used in the '604, '250, and '572 protests to mean both the engines and the outdrives, then Eaton could not argue its primary contention—that the engines and outdrives should be classified separately. The court then said:

> The posture of these protests is such that they support the appraisement and classification of the marine engines and outdrives as an entirety. And no amendment of the protests was sought or obtained at the time of trial which would have presented the issue of "non-entirety" to the court.

The Customs Court further considered that if the protests were intended to apply to only one of the two structures, it was impossible for the court to determine which of the two was so intended. It concluded:

> [S]ince characterization of the merchandise covered by said protests is patently insufficient to enable the court to proceed herein, the said motions to amend the protest[s] must be, and are hereby, denied, and said protests must be, and are hereby, dismissed *sua sponte* for legal insufficiency. U. Fujita & Co. et al. v. United States, 26 CCPA 63, T.D. 49611 (1938) * * *.

■ ■ Section 514 of the Tariff Act of 1930 provides that a protest must "[set] forth distinctly and specifically * * * the reasons for the objection * * * [to the classification]." This statutory provision and its predecessors have been construed to mean that a protest must be sufficiently precise to insure that the collector will know what is in the mind of the protestant, American Mail Line, Ltd. v. United States, 34 CCPA 1, 6, C.A.D. 335 (1946), and to indicate that the objection taken at trial was fairly in the mind of the protestant when the protest was made. Davies v. Arthur, 96 U.S. 148, 151, 24 L.Ed. 758 (1877); United States v. Sheldon & Co., 5 Ct.Cust.Appls. 427, 429, T.D. 34946 (1914). A protest is also the protestant's pleading in the Customs

Court and may be dismissed *sua sponte* if insufficient to confer jurisdiction. *U. Fujita & Co.*, supra. Hence the Customs Court could, in the present case, dismiss the involved protests if they were, in fact, insufficient. However, while the general objects of a protest are as set forth above, what constitutes a sufficient protest is necessarily dependent on the facts of each individual case.

■ ■ Turning first to the '250 protest, we think it clear from the language, as noted above, that the outdrives alone were the subject of objection. The protest is similar to the '083 protest where the Customs Court recognized that reference to classification with the marine engines in the protest inevitably leads to the conclusion that the merchandise discussed in the protest was the outdrives. The '250 protest should not, therefore, have been dismissed for insufficiency. If arguments advanced at trial were inconsistent with the original protest or an amended protest, then those arguments should not have been considered. There is a difference between a protest insufficient *ab initio* and a contention advanced at trial which is unsupported by the protest. See *American Mail Line, Ltd.*, supra, 34 CCPA at 7.

■ ■ Admittedly, the '604 and '572 protests are not as clear. The provision for machines n.s.p.f. and parts thereof claimed in the '604 protest and the alternatives of that machine provision and the engine provision claimed in the '572 protest could arguably apply to either the outdrives or the engines or both. We think, however, that denial of jurisdiction for insufficiency of protest is a severe action which should be taken only sparingly. Giving a liberal construction to the protests, we conclude that the collector could reasonably assume that any of the possibilities would have been preferable in the mind of the importer to the provision for parts of boats under which the engines and outdrives were classified. The several possibilities engendered by these alterna-

tives are not so numerous as to impose any undue burden on the collector. Hence, while the use of the phrase "Machine Parts" was, in the words of the Customs Court, "improvident," we do not feel that it leads to a fatal flaw in the '604 and '572 protests such that jurisdiction must be denied. The court below erred in dismissing the '604, '572, and '250 protests for failure to confer jurisdiction on the Customs Court.

We reverse the judgment of the Customs Court in Appeal No. 5476 and remand the cause for further proceedings not inconsistent herewith.

## APPEAL NO. 5478

This Government appeal involves the decision and judgment of the Customs Court with respect to protests 67/11820, 67/49180, 67/69511, and 68/31959 (hereinafter the '820, '180, '511, and '959 protests respectively). The merchandise which was the subject of these protests consisted solely of the aforementioned outdrives. They were classified as parts of pleasure boats under item 696.15 TSUS. Eaton principally claimed that the outdrives were properly classifiable under item 680.45 as fixed ratio speed changers and alternatively claimed that they were also classifiable as machines not specially provided for, and parts thereof, under item 678.50 TSUS.

The Customs Court held that item 696.15 was inapplicable to the outdrives. The court noted that the "yachts and pleasure boats" referred to in the superior heading of item 696.15 were limited to *foreign-built* boats. The Government does not dispute this point. However, the Government does disagree with the conclusion reached by the court below to the effect that the parts provision of item 696.15 likewise is limited to parts intended for use only with foreign-built boats. It is asserted that there is no basis for extending the limitation on boats to the provision for "parts thereof." The Government cites Border Brokerage Co. v. United States, 58 Cust.Ct.

240, C.D. 2948 (1967), wherein a different division of the Customs Court came to the opposite conclusion on the parts provision.

In the *Border Brokerage* case, the Customs Court noted that "[v]essels are treated as *sui generis* and not subject to duty unless Congress has specifically so provided" [1] citing The Conqueror, 166 U.S. 110, 41 L.Ed. 937 (1897) and United States v. Porto Rico Coal Co., 17 CCPA 288 (1929). After reviewing the introduction of the provision for boats into the Tariff Act of 1922, the court in *Border Brokerage* stated:

All of this shows that vessels are treated differently from other articles and that Congress intended to levy duty on certain pleasure boats imported and owned or imported and sold or chartered to residents, but not on all other vessels, many of which were instrumentalities of commerce. [2]

This court has held that it was the intent of Congress in the Tariff Act of 1930 "to assess duty upon foreign-built yachts * * * when brought into the United States for sale, and sold to a resident of the United States * * * [to thereby] encourage domestic industry and * * * protect American labor as well as * * * provide revenue." H. W. Chadbourne v. United States, 27 CCPA 85, 89, C.A.D. 66 (1939). The court below noted *Chadbourne* and concluded therefrom that:

[A]ny classification of imported articles under item 696.15 must be predicated upon a finding that such articles are in fact parts of *foreign*-built yachts or pleasure boats which are either owned by a resident of the United States, or are brought into the United States for sale to a resident thereof.

The court in *Border Brokerage* resolved the issue differently and held that:

Parts, however, do not necessarily have the same status as vessels. Canadian National Steamship Co., Ltd.

---

1. 58 Cust.Ct. at 246.

2. *Id.* at 247.

v. United States, 29 CCPA 123, C.A.D. 180 [(1941)] * * *.

*   *   *   *   *   *

While it would be relatively easy to determine at the time of importation whether imported yachts or pleasure boats were owned by residents or brought in for sale or charter to residents, it would be difficult, if not impossible, to determine this as to parts, many of which are used by boat builders who sell the completed boats to whatever customers they can find. No reason being evident for applying the restriction to parts, as there is to the boats themselves, we are of opinion that Congress did not so intend.[3]

■■■ We think the court in *Border Brokerage* came to the correct conclusion, and we hold the parts provision of item 696.15 not to be limited to replacement parts for foreign-built boats. To be dutiable, machines must necessarily be imported. Yet it cannot be doubted, as the Government points out, that an imported part need not be intended for use with only *imported* machines before it can be assessed under any of the numerous provisions for parts of such machines in the Tariff Schedules. The special limitations on dutiable pleasure boats arise from legal and historical considerations noted above which do not extend to parts of boats. Parts of boats, therefore, occupy a status no different from parts of other devices and need not be shown to be intended for use only with dutiable boats.

For the reasons given, the subject outdrives are not excluded from item 696.15 TSUS. However, if Eaton is correct in its assertion that item 680.45, directed to fixed ratio speed changers, in fact comprehends the merchandise, then regardless of the applicability of item 696.15, item 680.45 would be the proper classification by virtue of General Headnote 10(ij), which provides that:

[A] provision for "parts" of an article covers a product solely or chiefly used as a part of such article, but does not prevail over a specific provision for such part.

The Customs Court held the outdrives not to be fixed ratio speed changers and therefore concluded that item 678.50, which provides for machines n.s.p.f., is the correct classification.

One of Eaton's witnesses, John Hurst, an engineer, testified that the outdrive is "a fixed ratio speed changer, and performs a function of a transmission." He stated that the outdrive is supported on a transom and that the power is transmitted from the engine "through the transom, down a vertical shaft, and turns another ninety degree corner with a shaft that is parallel to the bottom of the boat."

Hurst's denotation of the outdrive as a "speed changer" is supported by Eatcated by the relative size of the bevel cutaway section of the outdrive. Rotational speed change of the shafts is indicated by the relative size of the level gears.

The court below stated:

Although Mr. Hurst characterized the outdrive as a "speed changer," his other testimony on the subject tends to negate any function of the outdrive as a speed changer. Mr. Hurst testified that the outdrive transmits the engine power horizontally, then down a verticle [sic] shaft and along a horizontal shaft. He also testified that the function of the clutch is to engage and disengage the gears to permit shifting from forward to reverse. These particular functions are not indicative of "speed changing" characteristics.

*   *   *   *   *   *

[T]he subject outdrive is in effect what its name implies, namely, a power train which performs under a single housing in delivering energy to the propeller of a boat of [sic; a?] function that is equivalent to the function performed by the power train of a conventional type motor vehicle un-

3. *Id.* at 247–48.

der separate housing (torque converter, transmission, drive shaft, universal couplings, differential, rear axles) in delivering energy to the rear wheels of a motor vehicle. Accordingly, we hold that the outdrives at bar are not speed changers * *.

Eaton alleges the following:

The "transmission" employed in automobiles is familiar to everyone. Due to the fact that internal combustion engines, in contrast to steam engines, must function at a relatively high number of revolutions per minute (several thousand), it is necessary to reduce the speed of the engine crank shaft to a far lower number of revolutions per minute in order to turn the main drive shaft which is connected to the driving wheels of the automobile. So, too, in a boat where the driving force is the propeller.

The outdrives here involved differ from other gear box transmissions in that the power of the engine is transmitted vertically up, over, and down the transom of the boat to a horizontal shaft to which the boat's propeller is attached. Its function, however, is the same as any other transmission, to reduce the number of engine revolutions and transmit the power of the engine to a driving mechanism.

A fixed ratio speed changer or gear box is one in which the gear ratio remains constant. In an automobile transmission, the gear ratio changes when the gears are "shifted" either manually or automatically. In the case of boats, such ratio changes are not necessary.

Eaton admits that the outdrive serves to transmit power as is clear from the above statement and its reference to Hurst's testimony which "served to explain how the outdrive, which he called a 'gearbox', *transmits* the engine power to the propeller shaft * * *." However, Eaton insists that the function of the outdrive remains that of a fixed ratio speed changer.

 We agree with the position taken by Eaton on this issue. It appears to us that the Customs Court erroneously regarded speed changing as a function which is inconsistent with, or at least independent of, power transmission. The two are not disparate functions of the subject outdrives. Power transmission may occur without speed change, but speed change necessarily includes power transmission. We think it clear from the testimony and exhibits that the outdrives are fixed ratio speed changers, and we therefore hold them to be properly classifiable under item 680.45 TSUS. Since that provision is relatively more specific than either item 696.15 or item 678.50, it is the correct classification.

The Customs Court erred in holding item 678.50 to be the correct classification. The judgment of the court below in Appeal No. 5478 is accordingly reversed.

Reversed.